## UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

## LAKE CHARLES DIVISION

| JOHN D. WILLIAMS | : | DOCKET NO. 2:04-cv-612 Section P |
|---|---|---|
| VS. | : | JUDGE MINALDI |
| CITY OF DEQUINCY, ET AL. | : | MAGISTRATE JUDGE WILSON |

## REPORT AND RECOMMENDATION

Currently before the court is a "Motion for Summary Judgment" [doc. 95] filed on behalf of L.A. "Buddy" Henagan and a "Motion for Summary Judgment" [doc. 97] filed on behalf of Michael Suchanek, Chief of Police of the City of DeQuincy.[1] These motions have been referred to the undersigned magistrate judge for review, report, and recommendation in accordance with 28 U.S.C. § 636(b)(1)(B).

## FACTS

In 1997, plaintiff, John D. Williams, was convicted of simple burglary in the City of New Orleans, Parish of Orleans, and on April 7, 1997, Williams was sentenced as an habitual offender to serve 8 years at hard labor in the custody of the Louisiana Department of Corrections. *See* Doc. 95, Exhibit A. On December 2, 1997, Williams was transferred from Orleans Parish Prison to Hunt Correctional Center. Then on December 29, 1997, Williams was transferred to C. Paul Phelps Correctional Center. On October 7, 2000, Williams was transferred to the DeQuincy City Jail where he remained until May 8, 2003 when he was transferred back to C. Paul Phelps Correctional Center.

---

[1] This motion also states that it was filed on behalf of Mayor Gary Cooper, in his official capacity as Mayor of the City of DeQuincy. However, Mayor Cooper is not a named defendant in this civil action.

Williams was released from the custody of the Department of Corrections on April 29, 2004.

Williams filed this civil rights action on March 25, 2004, alleging, *inter alia*, that he was required to work excessive hours for the City of DeQuincy and for the private interests of the defendants and that he was not compensated for this work performed during his incarceration in the DeQuincy City Jail. He claims that the failure to compensate him violates his rights under Thirteenth Amendment to the United States Constitution and the Fair Labor Standards Act (FLSA).[2]

The allegations in the complaints and the summary judgment evidence submitted by the parties indicate that upon Williams' transfer to the DeQuincy City Jail, he was given the position of trusty. In this position, he was charged with general maintenance duties for the City, including keeping up the police station, the Railroad Museum, City Hall, and ball parks; feeding the prisoners; and releasing and booking prisoners and immigration detainees. *See* Deposition of John Williams, pp.87-88. He was also called upon to wax floors at a nursing home, a church, and a housing development; to move furniture for various people including Henagan and Suchanek; work at the Railroad Museum on the weekends; to barbeque chicken for various fundraisers[3]; to help with set up, garbage detail, concessions, and transportation at the Railroad Festival[4]; to cut grass and set up inflatable space jumps for Chief Suchanek's private businesses; to ride around with Mayor Henagan

---

[2] Following the initial review of this matter, it was determined that the plaintiff only exhausted his claims relative to the failure of the defendants to pay him for the work performed while incarcerated in the DeQuincy City Jail. Thus, his allegations of other constitutional violations were dismissed under 42 U.S.C. § 1997e(a). Additionally, all of the defendants except Henagan and Police Chief Mike Suchanek were also dismissed.

[3] Plaintiff stated in his deposition that it was at Henagan's request that he would prepare and barbeque 500-1000 chicken halves for these fundraisers which occurred several times each month. He further stated that he and Eddie Dalquest would generally be required to work for 26 hours straight in order to accomplish all of the work which the barbeques entailed. *See* Deposition of John Williams, pp.134-136.

[4] Plaintiff stated in his deposition that during his incarceration in the DeQuincy City Jail, he worked at four Railroad Festivals and that he was required to work at least 20 hours a day during the festival weekends. *See* Deposition of John Williams, pp.136-139.

during the night to check on street lights that were out; and to re-boot the computers when there was a problem. *See* Deposition of John Williams, pp. 122-29, 133-37, 172, 70-76, 177, 187-88.

The evidence before the court also reveals that as a result of Williams' trusty status, he received certain privileges. Plaintiff was allowed to wear civilian clothing which was purchased for him, at least in part, by the City of DeQuincy. *See* Deposition of John Williams, p.109. Williams was given rides to area stores in order to make personal purchases for such things as food, cigarettes, and magazines. *See* Deposition of John Williams, p.37. He had free access to the internet and a private room with a telephone, washing machine, and cable television, including movie channels. *See* Deposition of John Williams, pp.140-42. Williams was allowed to have contact visits with females in his private room. *See* Deposition of John Williams, 146. Additionally, Williams was given the opportunity to make money by washing cars[5] and waxing floors[6] for private citizens. *See* Deposition of John Williams, pp.119-120, 124-126. Moreover, his deposition testimony indicates that he was paid for moving furniture at Henagan's house and for stripping and waxing the floors at Henagan's church. *See* Deposition of John Williams, pp. 123, 130. Williams also received payment from the Women's Federated League for work that he performed during the Railroad Festival for three of the four years that he worked at during the festival.[7] Additionally, there were

---

[5]Plaintiff states in his deposition that by washing cars for Mr. Martin, the owner of a pawn shop, he was able to purchase a necklace for his mother. *See* Deposition of John Williams, pp.119.

[6]Although plaintiff states that he did not get paid initially for waxing floors, he admitted during his deposition that eventually he was paid $25-$30 an apartment for stripping and waxing the floors of the nursing home and housing development. *See* Deposition of John Williams, pp. 124-127.

[7]The Railroad Festival is held in DeQuincy during the month of April. Plaintiff was transferred to the DeQuincy City Jail in October, 2000, and he returned to C. Paul Phelps Correctional Center in May, 2003. Therefore it appears that he would have been housed in DeQuincy for only three Railroad Festivals, i.e. the 2001, 2002,an d 2003 Railroad Festivals. Nevertheless, the plaintiff testified during his deposition that he worked at 4 of the Railroad Festivals and that he was not paid the first year but that he received compensation in the amounts of $500, $500 and $200 for years 2-4. *See* Deposition of John Williams, 138-39.

times when Williams was given clothing or cigarettes in exchange for work performed by him. *See* Deposition of John Williams, pp.130, 140.

Henagan and Suchanek have filed the motions for summary judgment currently before the court, seeking dismissal of the claims made against them by Williams under the Thirteenth Amendment claim and the FLSA. Williams has filed memoranda in opposition to these motions, and all delays have now run.

## **LAW AND ANALYSIS**

**I.      Involuntary Servitude**

When an incarcerated prisoner challenges as involuntary servitude the requirement that he work without pay, the Fifth Circuit has stated that "[e]valuation of such a case must begin and perhaps should end with consideration of the provisions of the Thirteenth Amendment to the United States Constitution itself." *Wendt v. Lynaugh*, 841 F.2d 619, 620 (5th Cir. 1988). Section 1 of the Thirteenth Amendment states as follows:

> Neither slavery nor involuntary servitude, except as punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.

It is clear from the express language of the Thirteenth Amendment that "when a person is duly tried, convicted and sentenced in accordance with the law, no issue of peonage or involuntary servitude arises." *Id.,* quoting *Draper v. Rhay*, 315 F.2d 193, 197 (9th Cir. 1963); *Ali v. Johnson*, 259 F.3d 317, 318 (5th Cir. 2001).

The evidence before the court clearly establishes that Williams was been convicted of simple burglary and sentenced as an habitual offender to serve 8 years in the custody of the Louisiana Department of Corrections. *See* Doc. 95, Exhibit A. Thus, it appears that Williams cannot state a

viable claim under the Thirteenth Amendment.

Williams attempts to distinguish his case by arguing that he was compelled to work on private property and not state property. However, this distinction is foreclosed by the Fifth Circuit's decision in *Murray v. Mississippi Department of Corrections,* 911 F.2d 1167 (5th Cir. 1990) wherein the Fifth Circuit "decline[d] to create a private-property exception to [its] prior holdings that an inmate may be compelled to work without pay; therefore, we must conclude that compelling an inmate to work without pay on private property does not violate his constitutional or civil rights and that he may not collect damages on this basis." *Murray, supra.* In so holding, the Fifth Circuit noted that "the thirteenth amendment specifically allows involuntary servitude as punishment after a conviction of a crime" and that it could find "no basis from which to conclude that working an inmate on private property is any more violative of constitutional or civil rights than working an inmate or public property." *Murray,* 911 F.2d at 1167-68.

Williams also attempts to distinguish his case from the jurisprudence foreclosing Thirteenth Amendment claims by convicted prisoners by arguing that he was not housed in a state facility. However, it is clear that, in accordance with La.R.S. 15:824, Williams was sentenced to the custody of the Louisiana Department of Corrections and not to any particular institution. Under Louisiana law, the Department of Corrections has the sole jurisdiction to determine the physical placement of prisoners and may exercise this jurisdiction to transfer prisoners from one correctional facility to another. *State v. Sylvester*, 94-2343, 648 So.2d 31, 33 (La.App. 4 Cir. 12/15/1994). Thus, the fact that Williams was transferred from C. Paul Phelps Correctional Center to the DeQuincy City Jail does not affect his status as a Department of Corrections inmate.

Lastly, Williams attempts to distinguish his case from the jurisprudence by arguing that he

was forced to work excessive hours. Williams concedes that because of his status as a convicted criminal he could be compelled to perform work, but he asserts that his Thirteenth Amendment claim is directed to the extra work he was required to perform while housed in DeQuincy. To the extent that Williams argues that his constitutional rights were violated by having to work excessive hours or by having to perform work that was beyond his physical ability, these claims are not cognizable under the Thirteenth Amendment. Such claims regarding working conditions would arise under the Eighth Amendment which prohibits the imposition of cruel and unusual punishment.[8] *See Ray v. Mabry*, 556 F.2d 881, 882 (8th Cir. 1977)(requirement that plaintiff work 90-120 hours per week, including Sundays, did not state a claim under the Thirteenth Amendment; however, work requirements which endanger an inmate's life or health could violate the Eighth Amendment); *Jones v. Brown*, 793 F.2d 1292, 1986 WL 16032 (6th Cir. 1986) (compelling an inmate to work does not violate the Thirteenth Amendment, although prison work requirements can violate the Eighth Amendment if the work endangers the inmates' life or health.); *Talkowski v. Lane*, 1990 WL 60706 (N.D. Ill. 1990)(claims regarding working conditions "sound more like claims of cruel and unusual punishment, which the Eighth and Fourteenth Amendments prohibit states from imposing."); *Sutton v. Indiana*, 1991 WL 222074 (N.D. Ind. 1991) (forcing an inmate to work while he was in "bad health" does not implicate the Thirteenth Amendment).

Additionally, the court points out that a showing of compulsion is a prerequisite to proof of involuntary servitude. *Watson v. Graves* 909 F.2d 1549, 1552 (5th Cir. 1990). Although Williams testified at his deposition that he could not refuse a work assignment, he also testified that he never

---

[8]However, there are currently no Eighth Amendment claims before this court. Any claims brought by Williams under the Eighth Amendment have previously been dismissed due to his failure to exhaust the available administrative remedies. *Williams v. City of DeQuincy*, 2:04-cv-612, docs. 36 & 53.

refused to perform a job or gave any indication that he did not want to do a particular task. *See* Williams' Deposition, pp.131-32. Williams' trusty status and the work that he performed while housed in the DeQuincy City Jail allowed him a degree of freedom which he would not otherwise have experienced. The evidence establishes that Williams was paid for some of the work performed by him and that he retained privileges, including privacy and access to the outside world, which are not common to the incarcerated person. Thus, it appears to the undersigned that Williams continued to work in exchange for the privileges he received. This type of choice, even if "painful", precludes a finding of involuntary servitude. *Watson*, 909 F.2d at 1552.

**II.    Fair Labor Standards Act Claim**

Williams also claims that, under the Fair Labor Standards Act (FLSA), he is entitled to be compensated at the federal minimum wage for work he performed for Henagan personally and for Suchanek's private businesses while incarcerated in the DeQuincy City Jail.

All parties admit that the applicability of the FLSA to prisoners is not straightforward. In order to determine whether a particular prisoner is covered by the FLSA, the courts must perform a case-by-case analysis of the FLSA with respect to the prisoner to determine if an employer-employee relationship exists. *Carter v. Dutchess Community College*, 735 F.2d 8, 12, n.1 (2nd Cir. 1984). The Fifth Circuit has provided some guidance to assist in this determination. Specifically, the Fifth Circuit has held:

1.   Prisoners, not sentenced to hard labor, who work outside of the jail for a private enterprise were FLSA employees of the private enterprise. *Watson v. Graves*, 909 F.2d 1549, 1556 (5th Cir. 1990);

2.   The sheriff or prison custodian is not the employer of an inmate who works in a

7

work-release program outside of the jail for a private employer. *Reimonenq v. Foti*, 72 F.3d 472, 475-76 (5th Cir. 1996);

3. Prisoners who work inside of a prison for a private enterprise are not FLSA employees of the private enterprise. *Alexander v. Sara, Inc.*, 721 F.2d 149, 150 (5th Cir. 1983); and

4. Prisoners doing work in and for the prison are not FLSA employees of the prison. *Loving v. Johnson*, 455 F.3d 562, 563 (5th Cir. 2006).

In reaching these conclusions, the Fifth Circuit considered the purpose of the FLSA and evaluated the "economic reality" of the relationship between the parties in light of the policies behind the FLSA.[9]

The FLSA was enacted "to improve the living conditions, bargaining strength vis-a-vis employers, and the general well-being of the American worker" and "to eliminate unfair competition among employers competing for business in the market and among workers looking for jobs." *Watson*, 909 F.2d at 1554; *Carter,* 735 F.2d at 13; *Reimonenq,* 72 F.3d at 476. In light of these policies, the court must evaluate the economic realities of the relationship by considering whether the alleged employer (1) had the power to hire and fire the employee; (2) supervised and controlled the employee work schedule or conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment records.

**A. Henagan**

There is nothing in the record to indicate that Henagan was an employer competing for

---

[9]However, in *Reimonenq v. Foti*, 72 F.3d 472, 475 (5th Cir. 1996), the Fifth Circuit held taht the "economic reality" test used to determine the existence of an employer-employee relationship for purposes of the FLSA does not apply in a jailer-inmate context.

business in the marketplace. The record before this court establishes that on three occasions, Williams performed work of a personal nature for Henagan, to wit, he moved furniture at Henagan's house; he stripped and waxed the floors of Henagan's church; and he traveled to Texas to pick up furniture which had been donated to Henagan by an elderly couple. Williams testified at his deposition that Mrs. Henagan paid him for moving furniture at the Henagan home and that Henagan paid him for waxing the floors of Eastern Heights Baptist Church. *See* Deposition of John Williams, pp. 123, 130. There is nothing in the record to indicate that Henagan "employed" Williams on a regular basis, and the court does not find that providing personal assistance to Henagan on three occasions over a four year period establishes an employee-employer relationship between these parties.

### B. Suchanek

In addition to his job as Police Chief for the City of DeQuincy, Suchanek owned at least two businesses, to wit, one which rented and set up inflatable space jumps and one which provided lawn care. Williams testified in his deposition that he was required to work for the Suchanek's private businesses after his regular work hours for the City of DeQuincy. He testified that he was required to set up and take down the space jumps for Suchanek on multiple occasions, oftentimes by himself. *See* Deposition of John Williams, pp. 69-81. Williams also stated that he was required to work for Suchanek's lawn care business at least three times a week and that on some occasions he would cut 4-5 lawns per day and not finish until after 10:00 p.m. *See* Deposition of John Williams, pp.84-86. Williams testified that although Suchanek was always paid for the work done, Suchanek never paid him for any of the work he performed for Suchanek's private businesses. *See* Deposition of John Williams, pp.78, 80, 81, 84-85.

Suchanek was William's custodian, but the evidence before the court establishes that he was also a private business owner for whom Williams performed work. Considering the evidence in the light most favorable to Williams and the fact that Suchanek's use of free inmate labor gave him an advantage in the marketplace[10], the court finds that there are genuine issues of material fact regarding whether an employer-employee relationship existed between Suchanek and Williams such that Williams would be covered by the FLSA.

For these reasons,

**IT IS RECOMMENDED** that the Motion for Summary Judgment" [doc. 95] filed on behalf of L.A. "Buddy" Henagan be **GRANTED** and that the plaintiff's claims against Henagan be **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER RECOMMENDED** that the Motion for Summary Judgment [doc. 97] filed on behalf of Police Chief Michael Suchanek be **GRANTED** to the extent that plaintiff's Thirteenth Amendment claim be **DISMISSED**. Otherwise, it is **RECOMMENDED** that the motion be **DENIED** and that the Fair Labor Standards Act claim against Suchanek remain pending.

---

[10] In *Watson, supra.*, the Fifth Circuit noted the advantages gained by the private enterprise who used inmate labor over its competitors, stating:

> Jarreau had at his disposal a "captive" pool of workers whom he had only to pay token wages. Those wages were well below the "going rate" for workers with the Inmates' skill and abilities. Unlike his competitors, Jarreau incurred no expense for overtime, unemployment insurance, social security, worker's compensation insurance, or other employee benefit plans because he had no "employees." Jarreau had no need to hire any non-inmate employees because his labor needs were in cheap and easy supply at his father-in-law's jail. Such a situation is fraught with the very problems that FLSA was drafted to prevent– grossly unfair competition among employers and employees alike.
>
> Obviously construction workers in the area could not compete with Jarreau's prices because they had to pay at *least* minimum wage for even unskilled labor, not to mention all of the above listed overhead costs avoided by Jarreau. It takes little imagination to recognize that job opportunities for non-inmate workers in the area were severely distorted by the availability of twenty dollar per day workers from the parish jail.

. *Watson,* 909 F.2d at 1555

Under the provisions of 28 U.S.C. §636(b)(1)(C), the parties have ten (10) business days from receipt of this Report and Recommendation to file any objections with the Clerk of Court. Timely objections will be considered by the district judge prior to a final ruling.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN TEN (10) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING ON APPEAL, EXCEPT UPON GROUNDS OF PLAIN ERROR, THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT.**

THUS DONE AND SIGNED in Chambers at Lake Charles, Louisiana, October 31, 2006.

_____
ALONZO P. WILSON
UNITED STATES MAGISTRATE JUDGE